# EXHIBIT A

RANDY ARMSTRONG

FAX NO. : 603-664-6768          Feb. 27 2007 01:33PM  P1

SIGNED COPY

STRANGE & NELSON
ATTORNEYS AT LAW
12424 WILSHIRE BOULEVARD, SUITE 1120
LOS ANGELES, CALIFORNIA 90025

BRIAN R. STRANGE*
PETER MARTIN NELSON‡
STEPHEN O. BARNES*
JOSEPH J. SHECHANI
KIM H. SWARTZ
CHETUAN L. SHAFFER**

*A PROFESSIONAL CORPORATION
‡ALSO ADMITTED IN NEW YORK
*ALSO ADMITTED IN THE
DISTRICT OF COLUMBIA
**ADMITTED IN PENNSYLVANIA ONLY

TELEPHONE (213) 207-0337
TELECOPIER (213) 207-0855

OF COUNSEL: CRAIG R. SPIEGEL
ALSO ADMITTED IN ILLINOIS AND TEXAS

FILE NO._____

As of June 30, 1988

BY FACSIMILE

Howard L. Sapper
President
Global Pacific Records
180 East Napa Street
Sonoma, CA  95476

        Re:  Do'a World Music Ensemble

Dear Howard:

        The following shall set forth the material terms of the
recording agreement ("Recording Agreement") between Global
Pacific Records ("Global"), on the one hand, and Ken LaRoche
and Randy Armstrong, performing as Do'a World Music Ensemble
("Do'a"), on the other hand.

        1.   Territory:  The world.

        2.   Term:  An initial period and three option periods,
the duration of which to be in accordance with Global's
associated label agreement ("Distribution Agreement") with
CBS Records ("CBS"), with each option to be exercisable by
Global by written notice to Do'a within 30 days of the end of
the then current period.

        3.   Recording Commitment:  One album plus one overcall
album in each period.

        4.   (a)  Royalties:  Do'a shall be entitled to receive
50% of the royalties payable to Global pursuant to the
Distribution Agreement, exclusive of any producer royalties
payable pursuant to paragraph 6(d) below, calculated, paid
and defined as Global's royalties are paid to it thereunder;
provided, Do'a's royalty shall be no less than 16-1/2% of the
"wholesale" price of "phonograph records" (as those terms are
defined in the Distribution Agreement) of U.S. sales through
normal retail channels, with royalty escalations of 1/2% at
phonograph record sales in excess of 75,000 but less than

1

FROM : RANDY ARMSTRONG                FAX NO. : 603-664-6768          Feb. 27 2007 01:34PM  P2

250,000, and an additional 1/2% escalation at phonograph record sales in excess of 250,000.

(b)    Alternative Market Royalties:   The "alternative market" shall have the definition contained in the Distribution Agreement, provided that if there is no such definition in the Distribution Agreement, Global and Do'a shall negotiate a definition in good faith, which definition shall include, without limitation, health food stores and other non-traditional retail outlets in which so-called "new age" music is now or hereafter sold.  With respect to sales of phonograph records sold in the "alternative market," the royalty payable shall be no less than a dollar amount equal to the following, based on 85% of sales by Global and CBS and their licensees (inclusive of packaging and all other costs, expenses, charges and the like):

|  (i)   Units | Albums and Cassettes | Compact Discs |
|---|---|---|
| First and Second Album: | | |
| Up to 20,000 | $1.00 | $1.25 |
| 20,001 - 75,000 | 1.05 | 1.35 |
| 75,001 or up | 1.10 | 1.45 |
| Third and Fourth Album: | | |
| Up to 20,000 | $1.05 | $1.30 |
| 20,001 - 75,000 | 1.10 | 1.35 |
| 75,001 or up | 1.15 | 1.45 |
| Fifth and Sixth Album: | | |
| Up to 20,000 | $1.10 | $1.35 |
| 20,001 - 75,000 | 1.15 | 1.40 |
| 75,001 or up | 1.20 | 1.50 |
| Seventh and Eighth Album: | | |
| Up to 20,000 | $1.15 | $1.40 |
| 20,001 - 75,000 | 1.20 | 1.45 |
| 75,001 or up | 1.25 | 1.55 |

(ii) Notwithstanding the foregoing, in the event CBS materially reduces its wholesale price with respect to compact discs, Global and Do'a shall negotiate a compact disc royalty in good faith in view thereof, provided that any material reductions taking place in July and August, 1988

2

shall not result in the negotiation of compact disc royalties hereunder.

(iii)   With respect to digital audio tapes, Global and Do'a shall negotiate a royalty in good faith, provided that such a royalty shall be no less than the royalty for compact discs.

(iv)   Reserves:   A reserve up to 25% may be withheld on both artist and mechanical royalties.   This reserve will be liquidated 25% semi-annually over a two year period.

(v)   Statements:   Royalty statements and royalties shall be sent within 15 days following receipt by Global of royalties from CBS, but in no event shall such statements and payments be sent later than 90 days from the end of the semiannual period (ending the 30th of June or 30th of December) in which Global receives such royalties from CBS.

5.   Mechanical Royalties: 75% of the then current U.S. statutory rate at the time of release of the album.   Except as provided in the Distribution Agreement with respect to the payment of mechanical royalties, there shall be no recoupment of recording costs or other amounts from mechanical royalties.

6.   Recording Advances:

(a)   First Album:   Do'a shall receive a recoupable recording advance ("Recording Advance") of $20,000 promptly upon execution of this agreement, and $5,000 promptly upon recoupment of the initial $20,000.

(b)   Subsequent Albums, if any:   The Recording Advance shall be determined by computing 50% of the previous records' royalties accrued as of the date of commencement of the new recording, without regard to reserves and without regard to recoupment, with the following minimums and maximums:

| Album No. | Minimum Recording Advance | Maximum Recording Advance |
|-----------|---------------------------|---------------------------|
| 2 | $20,000 | $35,000 |
| 3 | 22,500 | 50,000 |
| 4 | 25,000 | 60,000 |
| 5 | 30,000 | 70,000 |
| 6 | 35,000 | 80,000 |
| 7 | 40,000 | 90,000 |
| 8 | 45,000 | 90,000 |

3

FROM : RANDY ARMSTRONG          FAX NO. : 603-664-6768          Feb. 27 2007 01:37PM  P2

(c)   All Recording Advances shall be paid 50% upon commencement of recording and 50% promptly upon delivery of the master.

(d)   Global shall bear all costs (advances and royalties) in connection with the services of third party producers of the masters (except where such third party producers are engaged upon Do'a request) in addition to the recording advances provided in paragraph 6(b) above.

7.   If CBS does not release any Do'a album, this agreement terminates automatically. In such event, Do'a shall have the irrevocable right in perpetuity to purchase or cause a third party to purchase the masters not released by CBS at a price to be negotiated in good faith, taking into account the applicable recording budget and advance paid by Global and not in excess of the applicable recording advance actually paid by Global in connection therewith. In the event Do'a seeks to enter into an agreement with a distributor which customarily enters into recording or distribution agreements with artists of comparable style and stature to Do'a on financial terms which may be substantially less than the amount of all costs paid by Global for the masters, Global shall negotiate in good faith with Do'a regarding alternative means of reimbursing Global for any short fall (e.g., an "override" royalty).

8.   Do'a shall have the right to purchase "phonograph records" in cassette form at $4.50 and compact discs at Global's lowest wholesale price, such phonograph records to have the same packaging (artwork, jackets, inner sleeves, etc.) as top of the line phonograph records released by CBS. In the event Do'a desires to purchase records in twelve-inch disc form, Global and Do'a shall negotiate in good faith as to the price. Do'a shall have the right to sell phonograph records at Do'a's performances and live appearances and Do'a shall be paid record royalties and mechanical royalties in connection with such record sales.

9.   Global shall prepare a shortened version (radio version) of two mutually selected Do'a songs to be included on a CD sampler, the cost of which shall be borne by Global and shall constitute a recoupable advance to Do'a to be paid in addition to the applicable recording advance.

10.   Global shall assign its marketing and promotions staff to Do'a product of no less than four retail and three radio personnel out of Global's staff of seventeen.

11.   Creative Control:  It is Do'a's understanding that CBS may have certain creative controls pursuant to the Distribution Agreement. Subject to any such rights that CBS

4

may have, in all creative areas, as between Global and Do'a, there shall be mutual approval with respect to the second and third albums hereunder with Global having final approval, and on subsequent albums Do'a shall have final approval with respect thereto.  Notwithstanding the foregoing, Global and Do'a shall exercise their approval rights subject to the following guidelines:  Prior to recording an album, Global and Do'a shall mutually agree on the general concept for the album.  Do'a shall have the right to record songs of its own selection, provided such selections are reasonably consistent with and do not materially deviate from the concept.  Global may reasonably request Do'a to re-record selections, provided any costs in connection therewith shall be paid by Global in addition to the applicable Recording Advance and shall constitute additional recoupable advances.  In the event that CBS, not Global, requires that selections be re-recorded, the costs shall be borne as follows:

(a)  If the Recording Advance for the album is less than the Median between the Minimum Recording Advance and the Maximum Recording Advance for such album, then all costs in connection with the re-recording shall be paid by Global in addition to the applicable Recording Advance as additional recoupable advances.  The "Median" shall be determined by adding the Minimum Recording Advance and the Maximum Recording Advance together and dividing the sum in half.

(b)  If the Recording Advance for the album is equal to or greater than the Median, then the costs in connection with the re-recording shall be divided and paid by Global and Do'a (Do'a's share to be paid only out of any funds remaining from the Recording Advance after payment of all recording costs for such album) in accordance with the Re-recording Costs Ratio.  The "Re-recording Costs Ratio" shall be 75%/25% (Global/Do'a) if the Recording Advance is equal to the Median, 50%/50% if the Recording Advance is equal to the Maximum Recording Advance, and shall be on a sliding scale between such two ratios if the Recording Advance is in the range between the Median and the Maximum Recording Advance.  For example, if the Recording Advance is an amount half-way between the Median and the Maximum Recording Advance, the Re-recording Costs Ratio would be 62.5%/37.5%.  Notwithstanding the foregoing, Do'a shall never be required to make any payments hereunder in excess of the applicable Recording Advance, all such excess costs to be paid by Global as additional recoupable advances.

12.  Global shall in good faith submit to CBS the names of Ken LaRoche and Randy Armstrong for pre-approval as producers of Do'a's albums.

13.    Global acknowledges that music publishing and merchandising are specifically excluded from this agreement. Notwithstanding the foregoing, with respect to merchandising, Global has represented that CBS has the first right of negotiation in connection with Global's artists' merchandising rights.   If this is the case, Do'a would be agreeable to granting to CBS such rights.

14.   Do'a reserves its right to review and negotiate soundtrack and music licensing clauses which Global represents are required by CBS to be contained in this agreement.

15.   The terms of this agreement are based upon Global's verbal representations of the terms of the Distribution Agreement.   Accordingly, Do'a reserves its right to review, verify and negotiate all of such terms upon reviewing the relevant provisions of the Distribution Agreement.   Global shall immediately provide Do'a with copies of such provisions (including without limitation, term, recording commitment, record royalties, mechanical royalties, accounting, recording and release requirements, termination, creative control, soundtrack and master licensing, merchandising and the percent of previous record sales used in determining the amount of subsequent album advances).

16.    The parties intend to enter into a more formal agreement containing the terms herein as well as other terms customarily contained in recording agreements in the music industry (e.g., release guaranties, suspension, force majeure, attorneys fees, etc.).   The standard terms and conditions not embodied in this agreement shall be negotiated in good faith as to form.  Global shall give Do'a the benefit of any and all terms in the Distribution Agreement which are more favorable to the corresponding terms in the Recording Agreement.   If the parties fail to enter into a more formal agreement within a reasonable time, Global may have a security interest in (but shall not the right to release) the first master, Global Dance, delivered hereunder, and Do'a shall have the irrevocable right to "shop" said master and
///

///

///

///

///

///

6

yshall have the right, in perpetuity, to purchase or cause a
3rd party to purchase said Master for $20,000.

If the above correctly sets forth the terms of the
agreement, please so indicate by signing in the space
provided below.

Very truly yours,

Stephen D. Barnes

AGREED TO AND ACCEPTED:

GLOBAL PACIFIC RECORDS        DO'A WORLD MUSIC ENSEMBLE

By: Howard Sapper          By: _____
     Howard Sapper             Ken LaRoche

                              By: _____
                              Randy Armstrong

KHS:ob/14-64B
cc: Kim H. Swartz, Esq.

7

# EXHIBIT B

May 10, 2007


Wendy Starkweather (LaRoche)
3 Hatch Street
Peterborough, NH 03458

Re:    Rights to Do'a Songs

Dear Wendy:

By signing this letter, you assign to me all of your right, title and interest,
including, but not limited to, the worldwide copyright and exclusive administration
rights, in all sound recordings and musical compositions which Ken LaRoche performed
on and/or co-authored with me (the "Works"), including, but not limited to, the sound
recordings and musical compositions that appear on the album "World Dance" (the
"World Dance Works"). You also assign to me all contracts entered into by Ken LaRoche
which pertain to the Works. You also grant me a perpetual, non-exclusive, worldwide
license to use Ken's name, voice, likeness, other identification and biographical material
in connection with the marketing, promotion and exploitation of the Works. You agree
that from time to time after the date of execution of this Agreement, you will execute
other documents or assurances which may be required by me to effectively carry out the
intent of this agreement.

In full consideration for the rights granted in this agreement, you acknowledge
that you have received sufficient consideration, including cash payments. I agree to pay
you fifty percent (50%) of net profits associated with the exploitation of the World Dance
Works. "Net receipts" means Gross Receipts from the exploitation of the World Dance
Works, minus all costs and expenses attributable to or incurred by me, or my agents or
assigns, in connection with the exploitation and/or protection of the World Dance Works.
Those costs and expenses include, but are not limited to, distribution fees, marketing,
promotion and publicity costs, attorneys' fees, agent fees, administration fees, and other
payments made or costs incurred, by me in connection with the exploitation and/or
protection of the Works. Gross Receipts means all money actually received by me that is
derived directly from the exploitation of the World Dance Works. For the Works,
excluding the World Dance Works, I agree to pay you pursuant to the contract terms that
Ken and I entered into with Rounder Records.

Wendy Starkweather LaRoche
May 15, 2007
Page 2

The term of this Agreement is the duration of copyright in the Works, and any
renewals and extensions thereof, and shall automatically be extended to include the
duration of copyright in any and all derivatives of the Works.

You warrant and represent that you are free to enter into this Agreement and to
grant all of the rights granted hereunder, and that you have not made nor will make any
agreement, commitment, grant or assignment which will or might interfere with or impair
my complete enjoyment of those rights.

This letter agreement expresses the entire understanding between you and me. It
may be modified or amended only by a writing signed by both you and me, and may not
be assigned by you without my prior written consent. If for any reason any provision of
this agreement is adjudged by a court to be unenforceable, such adjudication shall in no
way affect any other provision of this agreement or the validity or enforcement of the
remainder of this agreement, and the affected provision shall be modified or curtailed
only to the extent necessary to bring it into compliance with applicable law. The terms of
this agreement will inure to the benefit of and be binding upon the parties hereto and their
respective successors and assigns. This agreement is entered into, and shall be governed
by and construed under the laws of the State of New Hampshire.

This agreement may be executed in one or more counterparts, all of which will be
considered one and the same agreement, and will become a binding agreement when one
or more counterparts have been signed by each party and an original, facsimile, or
electronic copy has been delivered to the other party.

All the best,

Randy Armstrong

AGREED TO AND ACCEPTED

Wendy Starkweather LaRoche

6-5-07
Date

# EXHIBIT C

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Form SR**
For a Sound Recording
UNITED STATES COPYRIGHT OFFICE

**SR 410-205**

SR / SRU
EFFECTIVE DATE OF REGISTRATION

7     9     07
Month   Day   Year

---

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

## 1
**TITLE OF THIS WORK ▼**
World Dance

**PREVIOUS, ALTERNATIVE, OR CONTENTS TITLES (CIRCLE ONE) ▼**

1) Wayo 2) Night-Season 3) Moth-Like Lovers Of The Light 4) The Awakening 5) 19 Letters 6) World Dance

## 2

**a** **NAME OF AUTHOR ▼**
Rounder Records Corp.

**DATES OF BIRTH AND DEATH ▼**
Year Born ▼     Year Died ▼

Was this contribution to the work a "work made for hire"?
☑ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶ USA
Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?    ☐ Yes ☐ No
Pseudonymous?  ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼
Sound recordings

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire," check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**b** **NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH ▼**
Year Born ▼     Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?    ☐ Yes ☐ No
Pseudonymous?  ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c** **NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH ▼**
Year Born ▼     Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?    ☐ Yes ☐ No
Pseudonymous?  ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

## 3

**a** **YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED**
1987
◀ Year   This information must be given in all cases.

**b** **DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK**
Complete this information ONLY if this work has been published.
Month ▶ 9   Day ▶ 15   Year ▶ 1988
USA   ◀ Nation

## 4

**a** **COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼
Randy Armstrong, 85 Beauty Hill Road, Barrington, NH 03825

**b** **TRANSFER** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼
Assignment

**APPLICATION RECEIVED**
|||| 0 0 2007
ONE DEPOSIT RECEIVED
|||| 0 0 2007
TWO DEPOSITS RECEIVED
7/9/07 **
FUNDS RECEIVED
L
DO NOT WRITE HERE FOR COPYRIGHT OFFICE USE ONLY

---

**MORE ON BACK ▶** • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.   • See detailed instructions.   • Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of 2 pages

\*Amended by C.O. from phone call to Aaron
Silverstein on November 28, 2007.

\*\*SPECIAL RELIEF GRANTED under
202.20(d) of the C.O. Regulations

| EXAMINED BY | Rm | FORM 9R |
| CHECKED BY | | |
| CORRESPONDENCE | | FOR COPYRIGHT OFFICE USE ONLY |
| X Yes | | |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?

☐ Yes   ☐ No   If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼

a. ☐ This work was previously registered in unpublished form and now has been published for the first time.

b. ☐ This is the first application submitted by this author as copyright claimant.

c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: Previous Registration Number ▼          Year of Registration ▼

**5**

**DERIVATIVE WORK OR COMPILATION**

Preexisting Material Identify any preexisting work or works that this work is based on or incorporates. ▼

**a**

Material Added to This Work Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**b**

**6**

See instructions
before completing
this space.

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a deposit account established in the Copyright Office, give name and number of Account.
Name ▼                                          Account Number ▼

**a**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent.   Name/Address/Apt/City/State/Zip ▼

Aaron Silverstein c/o Saunders Silverstein & Booth LLP, 172 State Street, Suite 3, Newburyport, MA 01950

**b**

Area code and daytime telephone number   978-463-9130          Fax number   978-463-9109

Email   silverstein@ssbooth.com

**7**

**CERTIFICATION\*** I, the undersigned, hereby certify that I am the

Check only one ▼

☐ author

☐ other copyright claimant

☑ owner of exclusive right(s)

☐ authorized agent of _copyright claimant_
                        Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

Randy Armstrong                                          Date   June 27, 2007

Handwritten signature ▼

**\*8**

| **Certificate will be mailed in window envelope to this address** | Name ▼ Aaron Silverstein c/o Saunders Silverstein & Booth LLP |
| | Number/Street/Apt ▼ 172 State Street, Suite 3 |
| | City/State/Zip ▼ Newburyport, MA 01950 |

**9**

17 U.S.C. §506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Form 9R-PLS   Rev: 11/2006   Prior: 11/2006—40,000   Printed on recycled paper          U.S. Government Printing Office 2007-550-848/60 106

# EXHIBIT D

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Form PA**
For a Work of Performing Arts

**PA 1-390-848**

▓▓▓▓▓▓▓▓▓▓▓

PAU

**EFFECTIVE DATE OF REGISTRATION**

7    9    07
Month    Day    Year

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

## 1

**TITLE OF THIS WORK ▼**

World Dance

**PREVIOUS OR ALTERNATIVE TITLES ▼**

1) Wayo 2) Night-Season 3) Moth-Like Lovers Of The Light 4) The Awakening 5) 19 Letters 6) World Dance

**NATURE OF THIS WORK ▼** See instructions

Musical works

## 2

**a**

**NAME OF AUTHOR ▼**

Ken LaRoche

**DATES OF BIRTH AND DEATH**
Year Born ▼ 1952    Year Died ▼ 2006

Was this contribution to the work a "work made for hire"?
☐ Yes
☑ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR ☐ Citizen of USA
☐ Domiciled in

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous? ☐ Yes ☑ No
Pseudonymous? ☐ Yes ☑ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼
Co-author of music

**NOTE**

Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**b**

**NAME OF AUTHOR ▼**

Randy Armstrong

**DATES OF BIRTH AND DEATH**
Year Born ▼ 1951    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☑ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR ☐ Citizen of USA
☐ Domiciled in

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous? ☐ Yes ☑ No
Pseudonymous? ☐ Yes ☑ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼
Co-author of music

**c**

**NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR ☐ Citizen of
☐ Domiciled in

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

## 3

**a** **YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED** This information must be given in all cases. 1987    Year

**b** **DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK** Complete this information ONLY if this work has been published. Month 9   Day 15   Year 1988    USA    Nation

## 4

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼

Randy Armstrong, 85 Beauty Hill Road, Barrington, NH 03825

**TRANSFER** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

Assignment

**APPLICATION RECEIVED**
JUL 09 2007
**ONE DEPOSIT RECEIVED**
JUL 09 2007
**TWO DEPOSITS RECEIVED**

**FUNDS RECEIVED**

DO NOT WRITE HERE

---

**MORE ON BACK ▶** • Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions. • Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of 2 pages

*Amended by C.O. from phone call to Aaron
Silverstein on November 28, 2007.

| EXAMINED BY | Rm | FORM PA |
| CHECKED BY | | |

☑ CORRESPONDENCE
  Yes

FOR
COPYRIGHT
OFFICE
USE
ONLY

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?

☐ Yes  ☑ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼ If your answer is No, do not check box A, B, or C.

a. ☐ This is the first published edition of a work previously registered in unpublished form.

b. ☐ This is the first application submitted by this author as copyright claimant.

c. ☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: Previous Registration Number ▼          Year of Registration ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation.
Preexisting Material Identify any preexisting work or works that this work is based on or incorporates. ▼

**a**

**6**

See instructions
before completing
this space.

Material Added to This Work Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**b**

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
Name ▼                                          Account Number ▼

**a**

**7**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/Zip▼
Aaron Silverstein c/o Saunders Silverstein & Booth LLP, 172 State Street, Suite 3, Newburyport, MA 01950

Area code and daytime telephone number  ( 978 ) 463-9130          Fax number  ( 978 ) 463-9109
Email asilverstein@ssbooth.com

**CERTIFICATION*** I, the undersigned, hereby certify that I am the

Check only one ►

☑ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☐ authorized agent of ___ copyright claimant

Name of author or other copyright claimant, or owner of exclusive right(s) ▲

**8**

*

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.

Randy Armstrong                                          Date  June 27, 2007

Handwritten signature (X) ▼

X

| Certificate will be mailed in window envelope to this address: | Name ▼ Aaron Silverstein c/o Saunders Silverstein & Booth LLP |
| | Number/Street/Apt ▼ 172 State Street, Suite 3 |
| | City/State/Zip ▼ Newburyport, MA 01950 |

• Complete all necessary spaces
• Sign your application in space 8

SEND ALL 3 ELEMENTS
IN THE SAME PACKAGE:
1. Application form
2. Nonrefundable filing fee in check or money order payable to Register of Copyrights
3. Deposit material

MAIL TO:
Library of Congress
Copyright Office
101 Independence Avenue SE
Washington, DC 20559-6000

**9**

*17 U.S.C. §506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

# EXHIBIT E

# GLOBAL PACIFIC RECORDS INC.

270 Perkins Street
Sonoma, California 95476
FAX (707) 996-2658
(707) 996-2748

## AGREEMENT #1

Between

Randy Armstrong and Volker Nahrmann

## UNU MONDO PRODUCTIONS
### and
### GLOBAL PACIFIC RECORDS, INC.

AGREEMENT made on November 30, 1993 by and between RANDY ARMSTRONG and VOLKER NAHRMANN p/k/a "UNU MONDO" Post Office Box 128, Dover, NH 03820 ("Owner" or "Artist") and GLOBAL PACIFIC RECORDS, INC., 270 Perkins Street, Sonoma CA 95476 ("Licensee").

WHEREAS, Owner owns and controls certain Master Recordings embodying the performances of the musical group "Unu Mondo" ("Artist"); and

WHEREAS, Licensee is in a position to provide manufacturing and/or marketing facilities for phonograph records worldwide, with the condition that, for any particular country or area-of-countries, if there is no placement of this album in that territory with 360 days of its release in the United States, the "Artist" reserves the right to directly market this album in that territory himself.

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants and promises hereinafter set forth, it is agreed:

1.

(a) Owner hereby exclusively licenses to Licensee the Master Recordings listed on Attachment A annexed hereto and made a part hereof (the "Masters") for the purpose of manufacturing, distributing and selling Phonograph Records in the Territory.

(b) Except as expressly provided in this agreement, all rights of any nature whatsoever in the Masters are reserved by Owner.

1

2. Owner hereby grants to Licensee the following rights, subject to the terms and conditions contained in this agreement:

· (a) The exclusive right during the Licensed Term to manufacture, distribute, sell, advertise, publicly perform and broadcast in the Territory, Records containing the performances embodied on the Masters or cause or permit others to do so (with the exception that Owner may purchase from Licensee compact discs of the Licensed Album for five dollars ($5.00) and cassettes of the Licensed Album for three ($3.00) for resale purposes). No royalties shall be payable to Owner for such product purchased by Owner.

(b) To use and allow others to use the names (including the group name), photographs and likenesses and any biographical material concerning each of the Artists whose performances are embodied on the Masters for advertising, and purposes of trade, and otherwise without restriction, in connection with the distribution and sale of Phonograph Records and the exploitation thereof. Global Pacific Records will clear remaining outstanding balance due by Unu Mondo Productions in lieu of an advance.

3.

a) Licensee shall pay to Owner a basic royalty at the applicable percentage, indicated below, of the applicable Royalty Base Price in respect to Net Sales of Phonograph Records consisting entirely of Masters sold by Licensee or its licensees at full price through normal retail channels for distribution in the United States paid for and not returned:

(i) On Singles: nine (9%) percent;

(ii) (A) On Albums: fifteen (15%) percent;

(b) The royalty rate pursuant to subsection 3 (a) (ii) (A) will apply to the first twelve thousand (12,000) units of NRC Net Sales in the United States ("USNRC Net Sales") of the Album. The royalty rate will be:

(1) eleven and one-half (11 1/2 %) percent on the next thirty-eight thousand (38,000) units of USNRC Net Sales of the Album.

(2) twelve (12%) percent on USNRC Net Sales of the Album in excess of fifty thousand (50,000) units.

(3) twelve and one-half (12 1/2%) percent on USNRC Net Sales of the Album in excess of one hundred thousand (100,000) units.

(4) thirteen (13%) percent on USNRC Net Sales of the Album in excess of two hundred and fifty (250,000) thousand units.

2

(5) 13.5% on 500,000 and above.

(b) The royalty for Phonograph Records sold through any Club Operation shall be fifty (50%) percent of the Company's net royalty receipts from such sales.

(c) With respect to Records sold in "compact disc" form, royalties shall be computed at ninety (90%) percent of the applicable royalty rate.

(d) The royalty rate on Mid-Price Records shall be twothirds (2/3) of the otherwise applicable basic royalty rate.

(e) The royalty rate on Budget Records, any Recording bearing a Reissue Label, any Multiple Record Set, Records sold as premiums, "Picture Discs" and for Records sold through Armed Forces Post Exchanges shall be one-half (1/2) of the otherwise basic applicable royalty rate.

(f) The royalty rate on Records sold for export shall be the full royalty rate hereabove if sold at full list price, or proportion thereof if sold at a reduced price.

(g) The royalty rate on Net Sales of Phonograph Records sold by Global Pacific Records or its Licensees for distribution through normal retail channels outside of the United States, paid for and not returned shall be fifty (50%) percent of Company's net receipts.

(h) Licensee shall have the right to license the Sides to third parties for all other types of use on a flat-fee basis. Licensee shall credit Owner's royalty account with fifty (50%) percent of the net amount received by or credited to Licensee and attributable to the Sides under each such license.

(i) For the sale of Records which include the Sides subject hereto which are sold by Licensee through the method known as "key outlet marketing" by distribution through retail fulfillment centers in conjunction with special advertisements on radio or television, the method known as direct mail or mail order, or by any combination of the methods set forth above, Licensee shall credit Owner's royalty account with fifty (50%) percent of Licensee's net royalty receipts and credits attributable to the Sides from such sales.

4. Notwithstanding anything to contrary contained in paragraph 3 hereof:

(a) With respect to Phonograph Records embodying masters together with other Master Recordings, the royalty rate payable to Owner shall be computed by multiplying the royalty rate otherwise applicable by a fraction, the numerator of

3

which is the number of Masters contained thereon and the denominator of which is the total number of Master Recordings (including Masters) contained on such Record.

. (b) No royalties shall be payable to Owner in respect of Phonograph Records sold or distributed by Licensee or its licensees for promotional purposes, or as cutouts after the listing of such Records has been deleted from the catalog of Licensee or the particular licensee, or as overstock, or as "free", "no charge", or "bonus" Records (whether or not intended for resale), or to radio stations.

(c) If Albums distributed as "free" or "no-charge" which are intended for resale through normal retail channels in the United States exceed fifteen (15%) percent of the total number of Albums distributed hereunder, Licensee will pay Owner Owner's normal royalty on such excess.

5.

(a) Accountings as to Artist royalties payable hereunder shall be made by Licensee to Owner within forty-five (45) days following each June 30th and December 31st for the preceding six (6 month period, together with the payment of accrued royalties, if any, earned by Owner during such preceding half-year. Owner shall have the right to appoint an accountant or attorney to examine Licensee's books and records relating to the sale of records hereunder provided that such examination shall take place at Licensee's offices during normal business hours, on reasonable written notice, not more frequently than once in any calender year.

(b) Licensee shall pay the first twenty seven hundred ($2,700) dollars to Volker Nahrman as reimbursements for his out of pocket expenses toward this recording.

(c) Licensee shall pay the next fifteen thousand ($15,000) dollars of royalties due directly to Blue Jay Recording Studio, 669 Bedford Rd. Carlisle, Mass.01741 as directed by Owner. Licensee shall send Owner an accounting of such royalties as well.

6. Licensee shall secure mechanical licenses from the copyright proprietors of all Compositions contained on the Masters and shall pay the Mechanical Royalties due to such copyright proprietor in connection therewith. Global Pacific Records agrees to provide "Artist" an accounting and royalties on a quarterly basis for Mechanical Royalties and semi-annual for Artist Royalties.

7.

(a) Owner shall deliver the Masters by supplying to Licensee one or more duplicate tapes, acetate masters or metal mothers and stampers (as selected and ordered by Licensee), satisfactory for the manufacture of Records for general sale. Such tapes or other parts shall be delivered to Licensee promptly following request. At the time of Delivery to Licensee of the first such tape or other part for each

4

master, Owner shall supply Licensee, in writing, the correct title of the recorded work, the names of the composer and publisher thereof, together with any additional copyright information known to Owner. Licensee to pay for preparation and mastering.

(b) Licensee shall be entitled to produce original album jacket artwork, at Licensee's own cost, to be used by Licensee in connection with the sale, distribution, advertising and promotion of Phonograph Records embodying the masters (the "Artwork"). Licensee, however, must acquire Owner's written approval of artwork, such approval not to be unreasonably withheld. Photo session and promotional poster will be provided.

8.

(a)        (i) The period during which Licensee shall have the exclusive right to manufacture and sell Phonograph Records derived from the Masters in the Territory is hereinafter referred to as the "Licensed Term". The Licensed Term shall be for a period of four (4) years from the date of the initial release of the Album. Within thirty (30) days of the expiration of this term, if mutually agreed upon in writing, the term will be extended.

(ii) If Global sells more than 22,500 units of "Hand in Hand" worldwide, during the first 12 months of release, Global has the option to trigger the first option period. Notification must be given within nine months of release date. Otherwise, it will be deemed to have been past on. If the option has been exercised then a firm recording date must be set within thirty days. First option period shall have a minimum advance of $24,000.00 or two thirds of artist royalties generated by the last record, whichever is greater. Second option period shall have a minumum advance of $31,500.00 or two thirds of artist royalties generated by the last record, whichever is greater. Recording date shall be as stated in 7 (a).

(b) Upon the expiration of the Licensed Term, Licensee shall continue to have the right to sell the then remaining copies of Records containing Masters in Licensee's inventory, on a nonexclusive basis only, for a period of six (6) months (the "Sell-Off Period"). All sales of Records by Licensee during the Sell-Off Period shall be in accordance with the terms and provisions hereof applicable to the sale of Records during the Licensed Term.

9.

(a) Owner warrants and represents that: Owner has the full and unencumbered right and power to enter into and fully perform this agreement; Licensee to pay any additional AFTRA rate payments to vocalists: Vince Ebo and Kim Flemming; Licensee shall not be required to make any payments of any nature for, or in connection with, the acquisition, exercise or exploitation of rights by Licensee pursuant to this agreement except as specifically provided in this agreement; Owner shall be responsible for and shall pay all royalties and other

5

sums which may become due to each of the Artists whose performances are embodied on the Masters and producers in connection with sale of Records hereunder other than mechanical royalties; no materials, furnished or selected by Owner contained in or used in connection with any Masters or the packaging, sale, distribution, advertising, publicizing or other exploitation thereof, or any use thereof, will violate any law or infringe upon or violate the rights of any person; and Owner will not enter into any agreement which would interfere with the full and prompt performance of Owner's obligations hereunder.

(b) Owner will at all times indemnify and hold Licensee harmless against any and all claims, damages, liabilities, costs and expenses, including reasonable attorney fees, paid or incurred by reason of any breach by Owner of any warranty, representation, or agreement made by Owner herein. Owner will reimburse Licensee on demand for any payment made at any time after the date hereof in respect of any liability or claim in respect of which Licensee is entitled to be indemnified. Owner shall receive prompt written notice of any claim or action to which the indemnity applies and shall be given the reasonable opportunity to defend against said claim or action at its expense. Pending the resolution of any claim in respect of which Licensee is entitled to be indemnified, Licensee shall have the right to withhold sums due Owner hereunder in an amount reasonably related to such claim.

(c) If because of an act of God, inevitable accident, fire, lockout, strike or other labor dispute, riot or civil commotion, act of public enemy, enactment, rule, order or act of any government or governmental instrumentality (whether federal, state, local or foreign), failure of technical facilities, failure or delay of transportation facilities, illness or incapacity of any performer or producer, or other cause of similar or different nature not reasonably within Licensee's control; Licensee is materially hampered in the manufacture, distribution, or sale of Records, then, without limiting Licensee's rights, Licensee shall have the option by giving Owner notice to suspend the Licensed Term or Sell-Off Period as the case may be, for the duration of any such contingency.

11. Definitions:

(a) "Master Recording" - every recording of sound, whether or not coupled with a visual image, by any method and on any substance or material, whether now or hereafter known, which is used in the recording, production and/or manufacture of Phonograph Records.

(b) "Records" and "Phonograph Records" - all forms of reproductions, now or hereafter known, manufactured or distributed primarily for home use, school use, juke box use, or use in means of transportation, embodying sound alone.

6

(c) **"Retail Price"** - The suggested retail list price from time to time of such Records in the country of manufacture of the country of sale as Company is paid. As of November 1, 1993 compact discs are $14.98 and cassettes are $9.98.

(d) **"Composition"** - a single musical composition, irrespective of length, including all spoken words and bridging passages and including a medley.

(e) **"Album"** - a 12-inch, 33-1/3 rpm Record embodying thereon not less than thirty (30) minutes of continuous sound, or the equivalent thereof in a disc or non-disc configuration.

(f) **"Budget Record"** - A Record bearing a Royalty Base Price at least thirty three and one third (33 1/3%) percent lower than the Royalty Base Price applicable to top-line Records in the same configuration.

(g) **"Mid-Price Record"** - a Record bearing a Royalty Base Price at least twenty (20%) percent, but not more than thirty three and one-third (33 1/3%) percent lower than the Royalty Base Price applicable to Licensee's top-line Records in the same configuration.

(h) **"Club Operation"** - any sales to consumers through record clubs or similar sales plans or devices.

(i) **"Delivery"** or **"Delivered"** - when used with respect to Masters, means the actual receipt by Licensee of fully mixed, edited Masters ready for Licensee's manufacture of Phonograph Records, and all necessary licenses and applicable approvals and consents, and Artwork.

(j) **"Mechanical Royalties"** - royalties payable quarterly to any Person for the right to reproduce and distribute copyrighted musical compositions on Phonograph Records.

(k) **"Artist(s)"** - the individual(s) whose performances are embodied on the Masters.

(l) **"Container Charge"** - (i) with respect to disc Phonograph Records in a single fold jacket, ten (10%) percent of the applicable Retail Price of such Phonograph Records; and (ii) with respect to disc Phonograph Records in a gate-fold jacket, or which contain an inser-t, fifteen
( 1 5%); with respect to cassette tape form, ten (10%) percent; and with respect to compact disc form, fifteen (15%) percent of the applicable Retail Price of such Phonograph Records.

7

(m) **"Net Sales"** - One hundred (100%) percent of gross sales less actual returns, credits and reserves (subject as herein provided) against anticipated returns and credits.

(n) **"Net Receipts"** - gross receipts less any and all third party payments.

(o) **"Company"** refers to Global Pacific Records, Inc. Doing business at 270 Perkins Street, Sonoma, California 95276.

(p) **"Company's Net Royalty Receipts"** - Net royalty receipts are:

CD's: $Y \times Z \times 90\% \times 85\%$ = CD Royalties
Cassettes: $Y \times Z \times 100\% \times 90\%$ = Cassette Royalties
($Y$ = Current Retail Price and $Z$ = Royalty Rate)

12. As to all matters treated herein to be determined by mutual agreement, or as to which approval or consent is required, such agreement, approval or consent will not be unreasonably withheld. Owner's agreement, approval or consent, required shall be deemed to have been given unless Owner notifies Licensee otherwise within ten (10) days following the date of Licensee's written request to Owner therefore.

13. Except as otherwise specifically provided herein, all notices hereunder shall be in writing and shall be given by personal delivery, registered or certified mail or telegraph (prepaid), at the addresses shown above, or such other address or addresses as may be designated by either Party. Notices shall be deemed given when mailed or delivered to a telegraph office, except that notice of change of address shall be effective only from the date of its receipt. Copies of all notices to Owner shall be sent to Howard L. Sapper 270 Perkins St. Sonoma Ca. 95476

14.

(a) Licensee shall supply Owner with sixty (60) promotional compact discs, and forty (40) promotional cassettes of the Licensed Album, as well as two hundred (200) promotional flyers.

(b) Licensee shall spend at least seven (7 %) percent of Licensee's net receipts from sales of the Album on promotion, and advertising.Label promises to spend atleast five thousand ($5000) dollars on promotion and marketing.

15.

(a) This agreement contains the entire understanding of the parties hereto relating to the subject matter hereof and cannot be changed or terminated except by an instrument signed by an officer of Licensee. A waiver by either party of any term or condition of this agreement in any instance shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof.

8

All remedies, rights, undertakings, obligations, and agreements contained in this agreement shall be cumulative and none of them agreement or either party.

(b) Licensee may assign its rights under this agreement in whole or in part, with mutual consent between GPR and Artists.

(c) This agreement has been entered into in the State of California, and the validity, interpretation and legal effect of this agreement shall be governed by the laws of the State of California applicable to contracts entered into in the State of California. The California courts (State and Federal), only, will have jurisdiction of any controversies regarding this agreement; any action or other proceeding which involves such controversy will be brought in those courts and not elsewhere. Any process in any such action or proceeding may, among other methods, be served upon Licensee by delivering it or mailing it, by registered or certified mail, directed to the address first above written or such other address as Licensee may designate. Any such delivery or mail service shall be deemed to have the same force and effect as personal service within the States of California.

(d) In entering into this agreement, and providing services pursuant hereto, Licensee shall have the status of independent contractor and nothing herein contained shall contemplate or constitute Licensee as Owner's agent or employee.

(e) This agreement shall not become effective until executed by all proposed parties hereto.

(f) Owner shall not be entitled to recover damages or to terminate the term of this agreement by reason of any breach by Licensee of its material obligations hereunder, unless Licensee has failed to remedy such breach within sixty (60) days following receipt of Owner's notice thereof.

16. PUBLISHING: "ARTIST" authorizes GLOBAL to seek out commercial sources of income from the use of "ARTIST" music, including not only "Hand in Hand", but also all the other music by "ARTIST" for which there are no exclusive rights. Artist's Publishing Companies are: Crimson Ark Music, BMI, and Nahrmann Music, BMI.

A. It is understood that "ARTIST" must approve in writing each such deal before "ARTIST" music may be utilized in each such case. "ARTIST" agrees to not withhold such approval except in extreme cases.
B. For any such work where the connection came about through GLOBAL, "ARTIST" agrees to give 35% of all such payments to GLOBAL, if the agreement involves already-existing "ARTIST" music.
C. For any such work where the connection came about through GLOBAL, "ARTIST" agrees to give 25% of all such payments to GLOBAL, if the agreement

9

involves creating new music. It is understood that in the case of creating new music, "ARTIST" would have to be centrally involved in negotiation details.

17. In case of of bankruptcy of either party , the non-bankrupt party reserves the right to continue this project with existing distributors. If GPR is unable to reorganize after filing of Chapter 11 then "Artists" will be entitled to the rights to their licensed masters back. Owner will regain control of master is Global Pacific Records, Inc. does not release album with six months after signing of agreement.

IN WITNESS WHEREOF, the parties have executed this agreement as of the date first hereinabove set forth.


_____     _____
Howard L. Sapper, President/CEO                          Date
GLOBAL PACIFIC RECORDS, INC.


_____     ___12/9/93_____
Randy Armstrong                                           Date


_____     ___12/9/93_____
Volker Nahrmann                                          Date


10

# GLOBAL PACIFIC RECORDS INC.

270 Perkins Street
Sonoma, California 95476
FAX (707) 996-2658
(707) 996-2748

## ATTACHMENT A

1. Smiling Back
2. Lakota
3. Hand In Hand
4. Matisse In Morocco
5. Bahji
6. Alegria
7. Nineteen 92
8. Egberto
9. Hamburg, USA
10. I Have A Dream

# GLOBAL PACIFIC RECORDS INC.

270 Perkins Street
Sonoma, California 95476
FAX (707) 996-2658
(707) 996-2748

## AGREEMENT #2

Between

Randy Armstrong and Volker Nahrmann

## UNU MONDO
### and
## GLOBAL PACIFIC RECORDS, INC.

Within this agreement, "Global" shall mean "Global Pacific Records, Inc."

Within this agreement "Artist" shall mean Randy Armstrong and Volker Nahrmann, p/k/a/ "Unu Mondo."

1.     "Artist" hereby verifies that they are the composers and the sole copyright owner of all the music on the album "Hand in Hand".

2.     "Artist" hereby licenses to Global the right to manufacture, distribute and market the album "Hand in Hand" as a cassette and compact disc, under the conditions outlined in this agreement. These rights will also apply to any future medium of sound-only, such as DCC, Mini-Disc, etc. for marketing recordings of this album.

A. Global's rights for this album are world-wide, with the condition that, for any particular country or area-of-countries, if there is no placement of this album in that territory within 360 days of its release in the United States, then "Artists" reserves the right to directly market this album in that territory himself.

B. Providing no breach of contract, this agreement remains in effect for four years from the date of the signing of this agreement. This agreement is automatically renewed in 3-year increments, unless either party gives written

1

notice to the other party that they wish to terminate this agreement, within 120 days of the then-current 3-year period.

3. In return for such rights, Global agrees to provide "Artist" an accounting and royalties on a quarterly basis for Mechanical Royalties and semi-annual for Artist Royalties, as follows:

    A. Both an accounting and a royalty payment will be sent to "Artist" by mail within 45 days of the end of each calender quarter. (For example: For the first quarter of any year, this is to be mailed out within 45 days of March 31.)

    B. The accounting will separately list foreign and domestic revenue.

    C. The check will be payable to Unu Mondo and mailed to:

        Unu Mondo Productions
        P.O Box 128
        Dover NH 03820

    D. For the United States and Canada, the royalties "Artist" is to receive shall be 15% for the first 12,000 units of retail for each cassette and CD, (plus 3/4 of statutory mechanicals, which shall be at least 40 cents per cassette or CD). CD royalties are paid on 90% of total sales. The remaining 10% to cover packaging deductions. Current suggested retail price is $14.98 for C.D.'s and $9.98 for cassettes.

    E. (a) Royalties will  de-escalate and then re-escalate at the following sales plateaus :

        12,000 to 50,000  at 11.5%
        50,000 to 100,000 at12 %
        100,000 to 250,000at 12.5%
        250,000 to 500,000 at1 3 %
        500, 000  and above at13.5%

    F. If GLOBAL *directly sells* this album to companies outside the United States or Canada for full price, the royalty rate "Artist" receives shall be the same as outlined above in #3.D. Product sold at discounted rates will bear proportional royalties.

4. PUBLISHING: "Artist" authorizes Global to seek out commercial sources of income from the use of "Artist" music, including not only "Hand in Hand", but also all the other music by "Artist" for which there are no exclusive rights.

2

A. It is understood that "Artist" must approve in writing each such deal before "Artist'" music may be utilized in each such case. "Artist" agrees to not withhold such approval except in extreme cases.

B. For any such work where the connection came about through Global, "Artist" agrees to give 35% of all such payments to Global, if the agreement involves already-existing "Artist" music.

C. For any such work where the connection came about through Global, "Artist" agrees to give 25% of all such payments to Global, if the agreement involves creating new music. It is understood that in the case of creating new music, "Artist" would have to be centrally involved in negotiation details.

5. Global is willing to sell cassettes and compact discs of "Hand in Hand" to "Artist" at any time, in any reasonable quantity, under the following conditions:

A. Global is not obligated to pay "Artist" royalties for any such cassettes or CD's directly purchased by "Artist" from Global.

B. "Artist" will pay $3.00 per cassette and $5.00 per compact disc for any such purchase.

C. All such cassettes and CD's purchased by "Artist" from Global during any particular quarter shall be paid for by deducting the amount due to Global from the royalties Global shall be paying to "Artist" for that quarter. In the event that, at the end of a quarter, "Artist" owes Global more than Global owes "Artist", "Artist" agrees to pay Global the appropriate amount, at the time the normal royalties are due.

6. PAYMENT TO "ARTIST"

A. Global agrees to directly pay Artist Royalties to Blue Jay Recording Studio, Bob Lawson proprietor until such time as the artist's outstanding obligations to the studios are fullfilled.

B. Global agrees to pay artist the Mechanical Royalties during this same period on a quarterly basis.

C. After studio recoupment all Artist Royalties will paid directly to artists.

3

## 7. PERFORMANCE AND OPTION CLAUSES

A. If Global sells more than 22,500 units of "Hand in Hand" world-wide, during the first 12 months of its release, "Global" has the option to trigger the first option period. Notification must be given within nine (9) months of release date. Otherwise it will be deemed to have been past on. If the option has been exercised then a firm recording date must be set within thirty days.

B. First option period shall have a minumum advance of S 24,000.00 or 2/3rds of artist royalties generated by the last record, whichevers greater.

C. Second option period shall have a minumum advance of $31,500 or 2/3rds of artist royalties generated by the last record, whichever is greater.

8. Global agrees to give "Artist" an active part in the design and lay-out of the packaging for the CD and cassette of this album. Existing artwork may be acceptable. Photo session and promotional poster will be provided.

9. Global agrees to maintain a reasonable inventory of both cassettes and CD's oF " Hand in Hand" at all times, beginning with the initial delivery.

10. Global agrees to provide "Artist" with 60 free CD's and 40 free cassettes of this album, from the initial deliveries, as free promotional give-away copies.

11. Global agrees to commit at least $5,000 towards the promotion and advertising of this album, and agrees to re-invest at least 7% of its billings from this album back into the promotion of this album, during its first year.

12. Global agrees to create a 2-color or full-color flyer, specifically for the purpose of promoting this one album. Global further agrees to provide "Artist" with a good quantity of these, to facilitate "Artist'" promotion of this album as well.

13. No changes can be made in this agreement without an agreement signed by both parties concerning the details of any such changes.

14. This agreement shall be upheld under the laws of the State of California.

15. In case of of bankruptcy of either party , the non-bankrupt party reserves the right to continue this project with existing distributors. If Global is unable to reorganize after filing of Chapter 11 then "Artists" will be entitled to the rights to their licensed masters back.

4

_____          12/13/93
HOWARD L. SAPPER                          DATE
GLOBAL PACIFIC RECORDS, INC.
270 Perkins Street
Sonoma, CA 95476

_____          12/9/93
RANDY ARMSTRONG                           DATE
UNU MONDO PRODUCTIONS
Post Office Box 128
Dover, NH 03820

_____          12/9/93
VOLKER NAHRMANN                           DATE
UNU MONDO PRODUCTIONS
Post Office Box 128
Dover, NH 03820

5

# GLOBAL PACIFIC RECORDS INC.

270 Perkins Street
Sonoma, California 95476
FAX (707) 996-2658
(707) 996-2748

## ATTACHMENT B

Agreement made this day of November 30, 1993 by and between Randy Armstrong and Volker Nahrmann p/k/a "Unu Mondo", Post Office Box 128, Dover New Hamshire 03820 (hereinafter referred to as "Artist") and Global Pacific Records Inc., 270 Perkins Street, Sonoma, California 95476, (hereinafter referred to as "Company").

### 1. TERM

1.1 The term of this agreement shall begin as of the date hereof. The first Contract Period of the term will end nine (9) months after initial release in the United States of a Phonograph Record derived from the Master Recordings made in fulfillment of your Recording Commitment under paragraph 3.1 below.

1.2 You grant Company one (1) option to extend the term for an additional Contract Period ("Option Period") on the same terms and conditions. Such option shall be deemed to be automatically exercised by Company unless Company shall give you written notice of Company's election not to exercise such option which notice shall be sent to you no later than thirty (30) days prior to the expiration date of the Contract Period which is then in effect. If Global sells more than 22,500 units of "Hand in Hand" worldwide, during the first twelve months of its release, Global has the option to trigger the first option period. Notification must be given within nine months of release date. Otherwise, it will be deemed to have been past on. If the option has been exercised then a firm recording date maust be set within thirty days. First option period shall have a minimum advance of $24,000.00 or two thrirds of artist royalties generated by the last record, whichever is greater. Second option period shall have a minimum advance of $31,500.00 or two thirds of artist royalties generated by the last record, whichever is greater.

1

## 2. SERVICES

2.1 During the term of this agreement, you will render your exclusive services as a performing artist for the purpose of making Master Recordings for Company, you will cause those Recordings to be produced and you will Deliver the Recordings to Company, as provided in this agreement. (You are sometimes called "Artist" below; all references in this agreement to you, "you and Artist", and the like, will be understood to refer to you alone.)

2.2 (a) Your obligations will include furnishing the services of the producers ("Producer") of those Master Recordings, and you will be solely responsible for engaging and paying them.

(b) If Company, instead, at your request, and with your approval, engages a Producer for any of those Master Recordings, the following terms will apply:

(i) Your royalty account and the production budget for the recording project concerned will be charged with a Recording Cost item in an amount equal to the advance, approved by you, paid to the Producer; and

(ii) Your royalty on those Master Recordings under paragraph 9 will be reduced by the amount of royalty approved by you, to be paid to the Producer, adjusted in proportion to the other royalty rates and royalty adjustments provided for in the other provisions of paragraphs 9 and 10.

## 3. RECORDING COMMITMENT

3.1 During each Contract Period you will perform for the recording of the Master Recordings sufficient to constitute one (1) Album, cause those Master Recordings to be produced, and Deliver them to Company (the "Recording Commitment").

3.2 You will fulfill the Recording Commitment for each Contract Period within the first four (4) months of the Period.

3.3 Each Album Delivered to Company in fulfillment of your Recording Commitment will consist entirely of Master Recordings made in the course of the same Album, unless Company consents otherwise. Company may withhold that consent in its unrestricted discretion.

## 4. RECORDING PROCEDURE

4.1 The following matters will be determined, in the order set forth below, by mutual agreement between Company and you.

2

(a).Selection of Producer.

(b).Selection of material, including the number of Compositions to be recorded.

(c) Specification of studios where recording is to take place. Any first class studio selected by you shall be deemed approved by Company.

(d) A proposed budget which shall be prepared sufficiently in advance of the planned commencement of recording to give Company a reasonable time to review and approve or disapprove it. If a budget submitted by you does not exceed the amount set forth in paragraph 6 hereof, such budget shall be deemed approved.

(e) You will comply with the following procedures in connection with the requirements of the U.S. Immigration Law:

(i) Before each recording session:

(A) You will require each background instrumentalist, background vocalist, and other person to be employed in connection with the session to complete and sign the Employee Information and Verification ("Employee") section of a U.S. Immigration and Naturalization Service Employment Eligibility Certificate (Form I-9), unless you have already obtained such a Certificate from the person concerned within the past three years;

(B) You will complete and sign the Employer Review and Verification ("employer") section of each such Certificate; and

(C) You will attach copies of the documents establishing identity and employment eligibility which you examine in accordance with the instructions in the employer section.

(ii) You will not permit any such person who fails to complete the employee section, or to furnish you with the required documentation, to render any services in connection with the Recordings to be made under this agreement.

(iii) You will deliver those Certificate and documents to Company promptly, and in no event later than the Delivery of the Recordings concerned.

(iv) You will comply with any revised or additional verification and documentation requirements of which Company advises you in the future.

3

4.2 As and when required by Company, you shall allow Company's representatives to attend any and all recording sessions hereunder.

4.3 You shall timely supply Company with all of the information it may reasonably request in order: (1) to make payments due in connection with such Recordings; (2) to comply with any other obligations Company may have in connection with the making of such Master Recordings; and (3) to prepare to release Phonograph Records derived from such Master Recordings.

4.4 Each Master Recording made hereunder shall be subject to Company's reasonable approval as commercially satisfactory for it manufacture and sale of Phonograph Records.

4.5 The Recordings to be made shall be studio Recordings. There shall be no "live" Recordings and no Composition previously recorded under this agreement without Company's prior written consent.

4.6 Nothing in this agreement shall obligate Company to continue or permit the continuation of any recording session or project, even if previously approved hereunder, if Company reasonably anticipates that the Recording Costs will exceed those specified in the approved budget or that the Recordings being produced will not be commercially satisfactory.

4.7 The Artist will not be required to perform together with any other royalty artist without Artist's consent. Company shall not be deemed to be unreasonable in rejecting any request by the Artist to record with another artist.

## 5. RECOUPABLE AND REIMBURSABLE COSTS

5.1 Company will pay all approved costs of instrumental, vocal and other personnel and all other Recording Costs approved by Company for the recording of such Master Recordings, and all other amounts required to be paid by Company pursuant to any applicable laws or collective bargaining agreement.

5.2 All Recording Costs will constitute Advances. Any Recording Costs in excess of a budget initially established under paragraph 4.1 or other amount approved in writing by us, and all Special Packaging Costs, will be your sole responsibility and will be paid by you promptly (or reimbursed by you if paid by Company). Those amounts will also be recoupable from monies becoming payable to you by Company under this agreement, to the extent to which they have not actually been paid or reimbursed as provided in the preceding sentence. All costs incurred by Company in connection with the production of Videos containing Artist's performances, or the acquisition of rights in such Videos and all direct expenses paid or incurred by Company in connection with

4

independent promotion or recordings of the Artist's performances (i.e., promotion by Persons other than our regular employees or those of the distribution of the Records concerned will constitute Advances.

## 6. ADDITIONAL ADVANCES

6.1 All monies paid to or on behalf of you or Artist during the term of this agreement other than royalties paid pursuant to paragraphs 9 and 12 hereof, shall constitute Advances unless otherwise expressly agreed in writing by an authorized officer of Company.

6.2 (a) One half of payment due will be paid upon commencement of project and the remaining half will be paid upon delivery to Company of the Master Recordings constituting each Album recorded pursuant to paragraph 3.1 in fulfillment of your Recording Commitment, Company will pay to you an Advance in the amount by which the applicable sum indicated below (the "Recording Fund") exceeds the Recording Costs for the Album:

(i) The amount of the Recording Fund for each Album will be two-thirds (2/3) of the amount of the royalties credited to your account on Net Sales Through Normal Retail Channels in the United State, and worldwide, of the Album of your Recording Commitment (or Licensed Album under the agreement dated NOVEMBER 3, 1993) Delivered most recently before the Delivery of the album concerned within six (6) months from the initial release of such Album in the United States, provided that such Recording fund shall not be less than the applicable minimum amount set forth below nor more than the applicable maximum amount set forth below:

|  | Minimum | Maximum |
|---|---|---|
| (1) The Album Delivered during the first Contract Period: | $24,000 | $60,000 |
| (2) The Album Delivered during the first Option Period: | $31,500 | $75,000 |

(b) Each such Advance will be reduced by the amount of any anticipated costs of mastering, remastering or remixing, and the estimated amount of any Recording Costs incurred but not yet billed to Company; any such anticipated costs which are deducted but not incurred will be remitted to you. If any Album other than the Album to be Delivered during the first Contract Period is not Delivered within the time prescribed in paragraph 3, the Recording Fund for that Album will be the applicable minimum Recording Fund for that Album unless otherwise agreed in writing by Company.

5

(c) Company shall pay all approved Recording Costs for each Album to be Delivered hereunder as bills are submitted to Company.

## 7. RIGHTS IN RECORDING

7.1 Each Master Recording made or furnished to Company by youor the Artist under this agreement or during its term, from theInception of Recording, will be considered a work made for hire for Company; if any such Master Recording is determined not to be a work made for hire, it will be deemed transferred to Company by this agreement, together with all rights in it. All Master Recordings made or furnished to Company by you or Artist under this agreement or during its term from the Inception of Recording and all Matrices and Phonograph Records manufactured therefrom, together with the performances embodied thereon, shall be the sole property of Company, free from any claims whatsoever by you or any other Person; and Company shall have the exclusive right to copyright such Master Recordings in its name as the owner and author thereof and to secure any and all renewals and extensions of such copyright throughout the world. You will execute and deliver to Company such instruments of transfer and other documents regarding the rights of Company in the Master Recordings subject to this agreement, and if you fail to sign such documents, then Company may sign such documents in your name or the name of the Artist and make appropriate disposition of them.

7.2 Without limiting the generality of the foregoing, Company and any person authorized by Company shall have the unlimited and exclusive rights throughout the world:

(a) To manufacture Phonograph Records by any method now or hereafter known, derived from the Master Recordings made under this agreement or during its term;

(b) To sell, transfer or otherwise deal in the same under any trademark, trade names and labels, or to refrain from such manufacture, sale and dealing (with the exception of Artists' right to purchase from Company for five dollars ($5.00) cents per compact disc and three ($3.00) dollars per cassette royalty free for resale); and

(c) To reproduce, adapt, and otherwise use those Master Recordings in any medium and in any manner, including but not limited to use in audiovisual works, without payment of any compensation to you or Artist except the royalties, if any, which may be expressly prescribed for the use concerned under paragraph

6

7.3 (a) If Company fails to release an Album of the Recording Commitment within one hundred twenty (120) days after the date of Delivery of the Album concerned, then the eight (8) month period referred to in paragraph 1.1 shall commence to run one hundred twenty (120) days after the date of Delivery of the Album concerned.

(b) The running of the one hundred twenty (120) day period referred to in subparagraph (a) above will be suspended (and the expiration date of each of those periods will be postponed) for the period of any suspension of the running of the term of this agreement under paragraph 15.2. If any such one hundred twenty (120) day period would otherwise expire on a date between October 15th and January 16th, its running will be suspended for the duration of the period between October 15th and January 16th, and its expiration date will be postponed by the same amount of time as such expiration.

(c) In case of bankruptcy of either part, the non-bankrupt party reserves the right to continue this project with existing distributors. If Global Pacific Records, Inc. is unable to reorganize after filing of Chapter 11 then "Artists" willbe entitled to the rights to their licensed master back.

## 8. NAMES AND LIKENESSES

8.1 Company and any Licensee of Company each shall have the right and may grant to others the right to reproduce, print, publish, or disseminate in any medium your name, the names, portraits, pictures and likenesses of the Artist and Producer(s) and all other persons performing services in connection with Master Recordings made under this agreement (including, without limitation, all professional, group and other assumed or fictitious names by them), and biographical material concerning them as news or information, for the purposes of trade, or advertising. The uses authorized by the preceding sentence include, without limitation, the use of those names, portraits, pictures, and likenesses in the marketing of Phonograph Records. You will periodically supply such portraits and pictures of Artist and biographical materials (collectively ~ID Materials") to Company and update the same for the uses specified in this paragraph. If Company uses ID Materials other than those furnished by you ("Other ID Materials"), it will make available to you, at its offices in Sonoma and send copies to you at your address first hereinabove written for your inspection and approval of the Other ID Materials that it proposes to use pursuant to this paragraph 8.1. If, within ten (10) days after Company has made such Other ID Materials so available to you, you do not submit substitute ID Materials to Company, satisfactory to Company in its sole discretion, you shall be deemed to have approved the Other ID Materials prepared by Company. Except as specifically provided for herein, during the term of this agreement, you shall not authorize any party other than Company to use your or Artist's name or likeness (or any professional group, or other assumed or

7

fictitious names used by you or Artist) in connection with the advertising or sale of:

· (a) Phonographic Records embodying your performances as a performing artist; or

(b) Blank recording tape or tape recording equipment, except professional and studio tape and recording equipment.

8.2 (a) Company and any Licensee of Company shall have the non-exclusive right to use Artist's legal and professional names, portraits, pictures, likenesses and other identification of Artist contained on the Album cover artwork of each Album Delivered by Artist in fulfillment of Artist~s Recording Commitment hereunder in connection with the manufacture, advertising, sale and/or distribution of products and merchandise other than Phonograph Records ("Merchandising Uses") by mail order, in record stores, the record department of stores and other retail outlets.

(b) In full consideration for Merchandising Uses, Company shall pay you a royalty of fifty (50%) percent of Company's gross receipts from Merchandising Uses after deducting of any actual direct expenses incurred by Company in connection with Merchandising

8.3 You and the Artist will cooperate with Company, as it reasonably requests, in making photographs and preparing other materials for use in promoting and publicizing Artist and the Recordings made under this agreement as well as promoting and publicizing the Recordings.

## 9. ROYALTIES

9.1 Company will pay you a basic royalty computed at the applicable percentage, indicated below, of the applicable Royalty Base Price in respect of Net Sales of Phonograph Records (other than audiovisual Records) consisting entirely of Master Recordings recorded or Delivered hereunder and sold by Company or its Licensees Through Normal Retail Channels for distribution in the United States paid for and not returned ("NRC Net Sales"):

(a) On Singles, Twelve-inch Singles and Extended Play Records: nine (9%) percent;

(b) On Albums sold for distribution in the United States:

(i) (A) Master Recordings made during the first Contract Period and first Option Period: eleven (11%) percent.

8

(B) The royalty rate pursuant to subsection 9 (b) (i) (A) will apply to the first twelve thousand (12,000) units of NRC Net Sales in the United States ("USNRC Net Sales") of each Album consisting of Master Recordings made during the first Contract Period and first Option Period. The royalty rate will be:

(1) eleven and one-half (11 1/2 %) percent on the next thirty-eight thousand (38,000) units of USNRC Net Sales of any such Album.

(2) twelve (12%) percent on USNRC Net Sales of any such Album in excess of fifty thousand (50,000) units.

(3) twelve and one-half (12 1/2%) percent on USNRC Net Sales of any such Album in excess of five hundred thousand (500,000) units.

(4) thirteen and one half (13 1/2 %) percent on USNRC Net Sales of any such Album in excess of two hundred and fifty thousand (250,000) units.

9.2 The royalty for Phonograph Records sold through any Club Operation shall be fifty (50%) percent of the Company's net royalty receipts from such sales.

9.3 With respect to Records sold in "compact disc" form, royalties shall be computed at ninety (90%) percent of the applicable royalty rate.

9.4 The royalty rate on Mid-Price Records shall be two-thirds (2/3) of the otherwise applicable basic royalty rate.

9.5 The royalty rate on Budget Records, any Recording bearing a Reissue Label, any Multiple Record Set, Records sold for export, Records sold as premiums, "Picture Discs" and for Records sold through Armed Forces Post Exchanges shall be one-half (1/2) of the otherwise basic applicable royalty rate.

9.6 The royalty rate on Net Sales of Phonograph Records sold by Company or its Licensees for distribution through normal retail channels outside of the United States, paid for and not returned shall be fifty (50%) percent of Company's net receipts.

9.7 (a) (i) On audiovisual Phonograph Records manufactured and distributed by Company in the United States, Company will pay you a royalty, computed and adjusted in accordance with this paragraph 9, of fifteen (15%) percent of the Wholesale Price in respect of Net Sales of such Phonograph Records through Normal Retail Channels for distribution in the United States.

9

(ii) The royalty for audiovisual Phonograph Records sold through any Club Operation shall be one-half (1/2) of the applicable royalty rate provided for in subparagraph 9.7 (a) (i) above.

(b) For all other uses of audiovisual Phonograph Records, you will be entitled to a royalty in the amount of fifty (50%) percent of Company's net receipts as compensation for the use of the Recordings in those Records, as computed after deduction of any direct expenses actually incurred by Company in connection with the production of the audiovisual Recordings concerned, the acquisition of rights in said Recordings, the exploitation of such audiovisual Recordings and the collection and receipt of the receipts derived therefrom. If any item of direct expenses is attributable to receipts from such uses of Master Recordings made under this agreement and other Master Recordings, the amount of that expense item which will be deductible in computing net receipts under this subparagraph will be determined by apportionment.

9.8 Company shall have the right to license the Sides to third parties for all other types of use on a flat-fee basis. Company shall credit your royalty account with a fifty (50%) percent of the net amount received by or credited to Company and attributable to the Sides under each such license.

9.9 For the sale of Records which include the Sides subject hereto which are sold by Company's Licensees through the method known as "key outlet marketing~ by distribution through retail fulfillment centers in conjunction with special advertisements on radio or television, the method known as direct mail or mail order, or by any combination of the methods set forth above, Company shall credit your royalty account with fifty (50%) percent of Company's net royalty receipts and credits attributable to the Sides from such sales.

## 10. MISCELLANEOUS ROYALTY PROVISIONS

Notwithstanding anything to the contrary contained in paragraph 9 hereof:

10.1 With respect to Phonograph Records embodying Master Recordings made hereunder together with other Master Recordings, the royalty rate payable to you shall be computed by multiplying the royalty rate otherwise applicable by a fraction, the numerator of which is the number of Sides contained thereon embodying Master Recordings made hereunder and the denominator of which is the total number of royalty bearing Sides contained on such Record. The royalty rate on an audiovisual Record containing a Video and other audiovisual works will be determined by apportionment based on actual playing time on the Record concerned.

10

10.2 No royalties shall be payable to you in respect of Phonograph Records sold or distributed by Company or its Licensees for promotional purposes, or as cutouts after the listing of such Records has been deleted from the catalog of Company or the particular Licensees, or as overstock, scrap or to radio stations. No royalties will be payable to you on "sampler" Records in tape form intended for free distribution to automobile purchasers and containing not more than two Recordings made under this agreement.

10.3 Company shall have the right to distribute Albums as "free" or "no charge" for special short term and catalogue programs in an amount not to exceed fifteen (15%) percent of the total number of Albums shipped during such program period without your consent.

10.4 Notwithstanding anything to the contrary contained in this agreement, Company may change the method by which it computes royalties (for some or all of the Territory) from a method based on retail list price to some other method (the "New Method"). The New Method shall be deemed incorporated herein in lieu of the present method of computing royalties with respect to Records derived from the Masters sold, after the implementation of the New Method; an appropriate reference in respect of the New Method shall replace the current references to the Retail Price; and the royalty rates provided for herein shall be adjusted to an appropriate royalty rate which would be applied to the New Method so that upon the first change to the New Method, the same number of pennies payable with respect to the top-line Albums in any configuration being sold by Company would be identical to that which was payable immediately prior to such change. All other adjustments to be made pursuant to this paragraph shall be based on net pennies and shall take into account all factors (including, without limitation, Company's regular "free goods "policies before and after Company's adoption of the New Method) affecting such net amounts.

## 11. ROYALTY ACCOUNTINGS

11.1 Company will compute your Artist royalties as of each June 30th and December 31st for the prior six (6) months. On the next August 15th or February 15th, Company will send you a statement covering those royalties and will pay you any net royalties which are due after deducting unrecouped Advances. Company will not be required to send you a statement for any period in which there are no sales or returns after the termination of your services hereunder except that Company shall send you such statement upon receipt of your written request for the same. Company may maintain royalty reserves against anticipated returns and credits which reserves shall not exceed twenty-five (25%) percent with respect to Albums shipped in any one (1) accounting period. Each reserve established shall be liquidated within four (4) accounting periods

11

from the accounting period in which such reserve was established. If Company makes an overpayment to you, you will reimburse Company for it; Company may also deduct it from any payments due or becoming due to you hereunder except from Advances and from payments for mechanical royalties. If Company pays you any royalties on Records which are returned later, those royalties will be considered overpayments.

11.2 Sales of Records for distribution outside the United States are called "Foreign sales" below. Company will compute your royalties for any foreign sale on the same basis, with the same deductions and in the same national currency in which Company's Licensee pays Company for that sale or credit therefore, and Company will credit those royalties to your account at the same rate of exchange at which the Licensee pays Company. For purposes of accounting to you, Company will treat any foreign sale as a sale made during the same six-month period in which Company receives its Licensee's accounting and payment for that sale. If any of Company's Licensees deduct any taxes from its payments to Company, Company may deduct a proportionate amount of those taxes from your royalties. If any law, government ruling, or any other restriction affects the amount of the payments which Company's Licensee can remit to Company, Company may deduct from your royalties an amount proportionate to the reduction in the Licensee's remittances to Company. If Company cannot collect payment for a foreign sale in the United States in U.S. dollars, it shall deposit for you any sums due you in a foreign depository of your designation.

11.3 Company will maintain books and records which report the manufacture and sales of the Phonograph Records for which royalties are payable to you. You may, at your own expense, examine those books and records, as provided in this paragraph only. You may make those examinations only for the purposes of verifying the accuracy of the statements sent to you under paragraph 11.1. You may make such an examination for a particular statement only once, and only within two (2) years after the date when Company sends you that statement under paragraph ll.l.You may make those examinations only during Company's usual business hours, and at the place where it keeps the books and records to be examined. If you wish to make an examination you will be required to notify Company at least thirty (30) days before the date when you plan to begin it. Company may postpone the commencement for your examination by notice given to you not later than five (5) business days before the commencement date specified in your notice; if it does so, the running of the time within which the examination may be made will be suspended during the postponement. If your examination has not been completed within two (2) months from the time you begin it and Company has not caused any delay in such examination, Company may require you to terminate it on seven (7) days notice to you at any time; Company will not be required to permit you to continue the examination after the end of that seven (7) day period. You will not be entitled to examine any manufacturing records or any other records that do not specifically report sales

12

of Phonograph Records, or gratis distributions of Phonograph Records, on which royalties are payable to you. You may appoint a certified public accountant or an attorney to make such examination for you but not if the same person or firm has begun an examination of Company's books and records for any Person except you and has not yet concluded it.

11.4 If you have any objections to a royalty statement, you will give Company specific notice of that objection and your reasons for it within two (2) years after the date when Company sends you that statement under paragraph 11.01. Each royalty statement will become conclusively binding on you at the end of that two (2) year period, and you will no longer have any right to make any other objections to it. You will not have the right to sue Company in connection with any royalty accounting, or to sue Company for royalties on Records sold during the period a royalty accounting covers, unless you commence the suit within one (1– year following timely objection made pursuant to this paragraph. If you commence a suit on any controversy or claim concerning royalty accountings rendered to you under this agreement, the scope of the proceeding will be limited to determination of the amount of the royalties due for the accounting periods concerned, and the court will have no authority to consider any other issues or award any relief except recovery of any royalties found owing. Your recovery of any such royalties will be the sole remedy available to you or Artist by reason of any claim related to Company's royalty accountings. Without limiting the generality of the preceding sentence, neither you nor the Artist will have the right to seek termination of this agreement or avoid the performance of your obligations under it by reason of any such claim.

## 12. LICENSES FOR MUSICAL COMPOSITIONS

12.1 (a) You grant to Company an irrevocable license, under copyright, to reproduce each Controlled Composition on Phonograph Records subject to this agreement and distribute them in the United States and Canada.

(b) For that license, Company will pay Mechanical Royalties on the basis of Net Sales, at the following rates:

(i) On Records (not including audiovisual Records) manufactured for distribution in the United States; the rate equal to seventy-five (75%) percent of the minimum compulsory license rate (without regard to playing time) applicable to the use of musical compositions on phonorecords under the United States copyright law on the date of Delivery of the applicable Album pursuant to paragraph 3 hereof or, if you have not timely Delivered the applicable Album as provided for in paragraph 3 hereof, on the date when the applicable Album should have otherwise been Delivered to Company.

13

(ii) On Records (not including audiovisual Records) manufactured for sale in Canada:

(A) The rate equal to the lower of the rate set forth in paragraph 12.1 (b) (i) or the rate equal to seventy-five (75%) percent of the lowest prevailing Mechanical Royalty rate in Canada on the general basis with respect to the use of musical Compositions on standard Phonograph Records on the date of Delivery of the applicable Album pursuant to paragraph 3 hereof or, if you have not timely Delivered the applicable Album as provided for in paragraph 3 hereof, on the date when the applicable Album should have otherwise been Delivered to Company.

(B) The rate applicable under this subparagraph (ii) will not be less than 6.25 cents per Composition, and not more than the rate which would be applicable to the Records concerned under subparagraph 12.2 (b) (i) above if they were manufactured for distribution in the United States.

The Mechanical Royalty on any Record described in paragraph 9.5 or sold through a Club Operation will be three-fourths (3/4) of the amount fixed above. If the Composition is an arranged version of a public domain work, the Mechanical Royalty on it will be half of the amount fixed in the first sentence. No Mechanical Royalties will be payable for any Records described in paragraph 10.2.

(c) The total Mechanical Royalty for all Compositions on any Album, including Controlled Compositions, will be limited to ten (10) times the minimum compulsory license rate (without regard to playing time) on the date of Delivery of the applicable Album pursuant to paragraph 3 hereof or, if you have not timely Delivered the applicable Album as provided for in paragraph 3 hereof, on the date when the applicable Album should have otherwise been Delivered to Company. The total Mechanical Royalty on any Single or Twelveinch Single will be limited to twice that amount. The total Mechanical Royalty on any Extended Play Record will be limited to five (5) times that amount. The total Mechanical Royalty on any two Record Set shall be twenty (20) times that amount. If, at Company's request, a Record in one configuration contains a different number of Master Recordings than the same Record in a different configuration and in such different configuration the total Mechanical Royalty for the Record exceeds ten (10) times the aforementioned amount Company shall pay such excess.

(d) Company will compute Mechanical Royalties on Controlled Compositions as of the end of each calender quarterannual period for that calender quarter. On the next May 15th, August 15th, November 15th, or February 15th, Company will send a statement covering those royalties and will pay any net royalties which are due. Company will not be required to send a

14

statement for any period in which there are no sales or returns. Company may maintain reasonable royalty reserves against anticipated returns and credits. Each reserve established shall not be held for an unreasonable period of time; retention of a reserve for two (2) years after it is established will not be considered unreasonable in any case. Each reserve established pursuant to this subparagraph (d) shall be liquidated equally within eight (8) accounting periods from the accounting period in which such reserve was established. If Company makes any overpayment of Mechanical Royalties on Controlled Compositions, Company may recoup it from any Mechanical Royalty payments due or becoming due to you. If Company pays any Mechanical Royalties on Controlled Compositions on Records that are returned later, those royalties will be considered overpayments. If the total amount of the Mechanical Royalties which Company pays on any Record consisting of Master Recordings made under this agreement including Mechanical Royalties for compositions which are not Controlled Compositions) is higher than the limit fixed for the Record under subparagraph 12.1 (c), that excess amount will be considered an overpayment also. Paragraphs 11.3 and 11.4 will apply to Mechanical Royalties.

12.2 You also grant to Company an irrevocable license under copyright to reproduce each Controlled Composition in Videos, to reproduce those Videos, distribute them, and perform them in any manner (including, without limitation, publicly and for profit), to manufacture and distribute Videos and other copies of them, and to exploit them otherwise, by any method and in any form known now or in the future, throughout the world, and to authorize others to do so. Company will not be required to make any payment in connection with those uses for promotional purposes and that license will apply whether or not Company receives any payment in connection with any use of any Video.

12.3 If the copyright in any Controlled Composition is owned or controlled by anyone else, you will use your best efforts to cause that person to grant Company the same rights described in paragraphs 12.1 and 12.2, on the same terms. If the copyright in any Controlled Composition is transferred, the transfer will be made subject to this agreement. If any Recordings made under this agreement contain copyrighted Compositions which are not Controlled Compositions and are not available to Company under compulsory license, you will use your best efforts to obtain mechanical licenses covering those Compositions for Company's benefit on the same terms as those which apply to Controlled Compositions under this paragraph 12, if Company so requests.

## 13. WARRANTIES, REPRESENTATIONS, RESTRICTIONS, INDEMNITIES

13.1 You warrant and represent:

(a) You have the right and power to enter into and fully perform this agreement.

15

(b) Company shall not be required to make any payments of any nature for, or in connection with, the acquisition, exercise or exploitation of rights by Company pursuant to this agreement except as specifically provided in this agreement.

(c) No materials submitted by artist or any use thereof, will violate any law or infringe upon or violate the rights of Company or any other Person. Materials, as used in this paragraph, mean: (i) all Controlled Compositions, (ii) each name used by Artist, individually or as a group, in connection with the Recordings made hereunder, and (iii) all other musical, dramatic, artistic and literary materials, ideas, and other intellectual properties furnished or selected by you or Artist and contained in or used in connection with any Recordings made hereunder or the packaging, sale, distribution, advertising, publicizing or other exploitation.

(d) Artist is or will become and will remain to the extent necessary to enable the performance of this agreement, a member in good standing of all labor unions or guilds, membership in which may be lawfully required for the performance of Artist's services hereunder.

13.2 No materials submitted by Company, or any use thereof, will violate any law or infringe upon or violate the rights of Artist or any other Person. For the purpose of this paragraph, materials shall include all musical, dramatic, artistic and literary materials, ideas and other intellectual properties furnished or selected by Company and contained in or used in connection with any Recordings made hereunder or the packaging, sale, distribution, advertising, publicizing or other exploitation.

13.3 (a) During the term of this agreement, you will not enter into any agreement which would interfere with the full and prompt performance of your and Artist's obligations hereunder, and except as specifically provided for herein, Artist will not perform or render any services as a performing artist for the purpose of making, promoting or marketing Phonograph Records or Master Recordings for any person other than Company.

(b) Notwithstanding anything to the contrary contained in subparagraph (a) above, Artist may perform as a background musician or singer accompanying a featured artist for the purposes of making Phonograph Records for others, provided:

(i) You and Artist have then fulfilled all of your respective obligations under this agreement, and such activity does not in any way interfere with the continuing prompt performance of your or Artist's obligations hereunder;

16

(ii) The Artist will not render a featured solo or "stepout" performance;

(iii) The Compositions so recorded shall not have been recorded by Artist for Company and Artist shall not be restricted from recording the same Compositions for Company thereafter;

(iv) Artist's name may only be used in connection with such Records, in the form of a courtesy credit to Company on the Album liners used for such Records, in the same position as the credits accorded to other performers and in type of the same size and prominence; and

(v) Except as expressly provided in section (iv above, neither Artist's name (or any similar name) nor any picture, portrait or likeness of Artist shall be used in connection with such recordings including, without limitation, on the front covers of Album containers, on sleeves or labels used for single Records, or in advertising, publicity or other form of promotion or exploitation without Company's consent, which Company may withhold in its unrestricted discretion notwithstanding any other provision of this agreement.

13.4 (a) A "Restricted Composition", for the purposes of this paragraph, is a Composition which shall have been recorded by Artist for a Master Recording made or delivered to Company under this agreement. The Artist will not perform any restricted Composition for any person except Company for the purpose of making Master Recordings or Phonograph Records, at any time before the later of the following dates: (i) the date five (5) years after the date of Delivery to Company of all the Master Recordings made in the course of the same Album (or other recording project) as the Recording of the restricted Composition concerned; or (ii) the date two (2) years after the expiration of the term of this agreement.

(b) Neither you nor the Artist shall authorize or knowingly permit Artist's performances of a Composition recorded hereunder to be recorded for any purpose without an express written agreement prohibiting the use of such recording for making, promoting or marketing Master Recordings or Phonograph Records in violation of the restrictions prescribed in paragraphs 13.3 and 13.4 (a).

13.5 (a) During the term of this agreement, the Artist will not render any musical performance (audiovisual or otherwise) for the purpose of making any motion picture or other audiovisual work ('picture' below) for any Person other than Company, and no Person other than Company will be authorized to produce, distribute, exhibit, or otherwise exploit any picture which contains any musical performance (audiovisual or otherwise) by the Artist, without any express written agreement providing that:

17

           (i) The picture concerned will not contain performances by the Artist of more than two (2) musical compositions, in whole or in part; and

           (ii) Not more than one-half (1/2) of any version of the picture may consist of featured musical performances (defined below) by the Artist or anyone else.

     (b)"Featured musical performance", in this paragraph means:

          (i) Any visual performance of a musical composition;

          (ii) Any background performance of a musical composition which is intended as a focus of audience attention, whether or not the visual matter is related dramatically to the lyrics or concept of the musical composition.

    13.6 If you or Artist shall become aware of any unauthorized recording, manufacture, distribution or sale or any other activity by any third party contrary to the restrictions in this agreement, you and Artist shall notify Company thereof and shall cooperate with Company, at Company's expense, in the event that Company commences any action or proceeding against such third party.

    13.7 The services of Artist are unique and extraordinary, and the loss thereof cannot be adequately compensated in damages, and Company shall be entitled to seek injunctive relief to enforce the provisions of this agreement.

    13.8 You will at all times indemnify and hold harmless Company and any Licensee of company from and against any and all claims, damages, liabilities, costs and expenses, including legal expenses and reasonable counsel fees, arising out of any breach by you of any warranty or agreement made by you herein. You will reimburse Company and/or its Licensees on demand for any payment made at any time after the date hereof in respect of any liability or claim in respect of which Company or its Licensees are entitled to be indemnified, provided any such claim is adjudicated to a final judgment or settled with your consent, which consent shall not be unreasonably withheld. Company shall have the right to settle any claim in an amount not to exceed Two Thousand Five Hundred ($2,500) Dollars without your consent, but, with notification to Artist. Pending the resolution of any claim in respect of which Company is entitled to be indemnified, Company will not withhold monies which would otherwise be payable to you under this agreement in an amount exceeding your potential liability to Company under this paragraph. Company shall notify you of each such claim and you shall have the right to participate in the defense thereof at your expense.

18

## 14. DEFINITIONS

14.1 **"Master Recordings"** - every recording of sound, whether or not coupled with a visual image by any method and on any substance or material, whether now or hereafter known, which is used in the recording, production and/or manufacture of Phonograph Records.

14.2 **"Inception of Recording"** - the first recording of performances or other sounds with a view to the ultimate fixation of a Master Recording. "Master Recordings from the Inception of Recording" include, without limitation, all rehearsal recordings, "outtakes", and other preliminary or alternate versions of sound recordings which are created during the production of Master Recordings made under this agreement.

14.3 **"Matrix"** - any device now or hereafter used, directly or indirectly, in the manufacture of Phonograph Records and which is derived from a Master Recording.

14.4 **"Person"** and **"Party"** - any individual, corporation, partnership, association or other organized group of persons or legal successors or representatives of the foregoing

14.5 **"Records" and "Phonograph Records"** - all forms of reproduction, now or hereafter known, manufactured or distributed primarily for home use, school use, juke box use, or use in means of transportation, embodying (a) sound alone or (b) sound coupled with visual images , e.g. "sight & sound" devices.

14.6 **"Retail Price"** - The suggested retail list price from time to time of such records in the country of manufacture or the country of sale, as Company is paid.

14.7 **"Royalty Base Price"** - the applicable Retail Price of Phonograph Records less all taxes actually included in the Retail Price and less the applicable container charge.

14.8 **"Container Charge"** - (a) with respect to disc Phonograph Records in a single fold jacket, ten (10%) percent of the applicable Retail Price of such Phonograph Records; (b) with respect to disc Phonograph Records in a gate-fold jacket, or which contain anything other than a standard white inner sleeve pertaining solely to Artist, fifteen (15%) percent of the applicable Retail Price of such Phonograph Records; (c) with respect to Phonograph Records in non-disc configurations, fifteen (15%) percent of the applicable Retail Price of such Phonograph Records; and (d) with respect to Phonograph Records in compact disc form, fifteen (15%) percent of the applicable Retail Price of such Phonograph Records.

19

14.9 "Net Sales" - one hundred (100~) percent of gross sales less returns, credits and reserves against anticipated returns and credits.

14.10 "Club Operation" - any sales to consumers through record clubs or similar sales plans or devices.

14.11 "Contract Period" - the initial period, or any option period, of the term hereof (as such periods may be suspended or extended as provided herein).

14.12 "Advance" - amount recoupable by Company from royalties to be paid to or on behalf of you pursuant to this agreement.

14.13 "Composition" - a single musical composition, irrespective of length, including all spoken words and bridging passages and including a medley.

14.14 "Controlled Composition" - a composition, or that part thereof, written, owned or controlled by you, Artist, a Producer or any person or entity in which you, Artist or a Producer have a direct or indirect interest.

14.15 (a) "Album" - one or more twelve-inch 33 1/3 rpm records, or the equivalent, at least thirty-five (35) minutes in playing time and embodying thereon not less than seven (7) nor more than ten (10) Sides in a single package.

(b) "Single" - a 45 rpm disc Record not more than seven (7) inches in diameter, or the equivalent in an non-disc configuration.

(c) "Twelve-inch Single" - a 12-inch disc Record, or the equivalent in a non-disc configuration, which contains Recordings of not more than three (3) Compositions and does not constitute an Album.

(d) "Extended Play Record" - a Record which contains Recordings of at least four (4) but not more than six (6) Compositions but does not constitute an Album. (Audiovisual Records are not Albums, Singles, Twelve-inch Singles, or Extended Play Records.) For the purposes of subparagraphs (c) and (d), Recordings of more than one (1) arrangement or version of the same Composition will be considered Recordings of one Composition.

14.16 "Side" - a Recording embodying your performances of sufficient playing time to constitute one side of a 45 rpm record, but not less than two and one-quarter (2 1/4) minutes of continuous sound. If any Album (or other group of Master Recordings) Delivered to Company in fulfillment of a Recording Commitment expressed as a number of Sides includes Master Recordings of more

20

than one (1) arrangement or version of any Composition, all of those Recordings will be deemed to constitute one (1) Side.

14.17. "Sales Through Normal Retail Channels in the United States" - sales other than as described in paragraphs 9.2, 9.4, 9.5, 9.6, 9.8 and 9.9 hereof.

14.18 "Licensees" - includes, without limitation, subsidiaries, wholly or partly owned, and other divisions of Company or any licensee of Company.

14.19 "Delivery" or "Delivered" - when used with respect to Master Recordings, means the actual receipt by Company of fully mixed, edited and equalized Master Recordings, commercially satisfactory to Company in Company's reasonable business judgment and ready for Company's manufacture of Phonograph Records, and all necessary licenses and applicable approvals and consents, and all materials required to be furnished by you to Company for use in the packaging and marketing of the Records.

14.20 "Budget Record" - A record, bearing a Royalty Base price more than thirty-three and one-third ~33 1/3%) percent lower than the Royalty Base Price applicable to the top line Records in the same configuration (e.g., Album, Twelve-inch Single, tape cassette, compact disc, etc.) released by Company or its Licensees in the territory concerned.

14.21 "Mid-price Record" - A Record, whether or not previously released, bearing a Royalty Base Price at least twenty percent (20%), but not more than thirty-three and one-third (33 1/3%) percent, lower than the Royalty Base Price applicable to the top line Records in the same configuration.

14.22 "Multiple Record Set" - an Album containing two or more 12-inch 33 1/3 rpm Records packaged as a single unit, or the equivalent.

14.23 "Recording Costs" - all amounts representing direct expenses paid or incurred by Company in connection with the production of finished Master Recordings under this agreement. Recording Costs include, without limitation, the costs of musicians, vocalists, travel, rehearsal and equipment rental expenses, advances to producers, studio and engineering charges in connection with Company's facilities and personnel or otherwise, and the cost of remixing (except the cost of remixing for the release of Singles).

14.24 "Mechanical Royalties" - royalties payable to any Person for the right to reproduce and distribute copyrighted musical compositions on Phonograph Records.

14.25 "Video" - an audiovisual work owned or controlled by Company and containing a sound or visual recording of a performance by Artist.

21

14.26 "Territory" - the world.

14.27 "Reissue Label" - a label, such as the Harmony or Odessey label, used primarily for reissues of recordings released previously.

14.28 "Special Packaging Costs" - costs incurred by us in creating and producing Album covers, sleeves, and other packaging elements, in excess of the following amounts; (a) four thousand ($4,000) dollars per album for design of artwork (including expenses for reproduction rights); (b) three thousand ($3,000) dollars per Album for preparation of film (color separations); ~c) packaging manufacturing costs of twenty-five ($.25) cents per longplaying disc Album unit, twenty-two ($.22) cents per tape cassette Album unit ( including the cost of the "C-O" cassette housings), and sixty-six ($.66) cents per compact disc Album unit, for Albums manufactured for distribution in the United States or Canada; and (d) for Albums in those configurations manufactured for distribution elsewhere, the standard packaging manufacturing costs incurred by us or the licensee concerned for Albums manufactured in the same territory as the Album units concerned. (e) Any cost that exceeds these amounts must be agreed upon by GPR and Artists.

14.29 "Company"- refers to Global Pacific Records, Inc. Doing business at 270 Perkins Street, Sonoma, California 95276.

14.30 "Company's Net Royalty Receipts" - Net royalty receipts are:

CD's: $Y \times Z \times 90\% \times 85\%$ = CD Royalties
Cassettes: $Y \times Z \times 100\% \times 85\%$ = Cassette Royalties

## 15. REMEDIES

15.1 If you do not fulfill any portion of your Recording Commitment within the time prescribed in paragraph 3, Company will have the following options:

(a) to suspend the term of this agreement and Company's obligations to make payments to you under this agreement until you have cured the default;

(b) to terminate the term of this agreement at any time before the date on which you have fully cured the default.

Company may exercise each of those options by sending you the appropriate notice that if you do not fulfill your Recording Commitment within thirty (30) days from the date of such notice, then the term of this agreement

22

will be suspended or terminated, as the case may be, upon the expiration of such thirty (30) days. If Company terminates the term under subparagraph 15.1 (b) all parties will be deemed to have fulfilled all of their obligations under this agreement except those obligations which survive the end of the term (such as indemnification obligations, re-recording restrictions and the obligation to pay royalties, if any are due). No exercise of an option under this paragraph will limit Company's rights to recover damages by reason of your default, or any of its other rights.

15.2 If because of an act of God, inevitable accident, fire, lockout, strike or other labor dispute, riot or civil commotion, act of public enemy, enactment, rule, order or act of any government or governmental instrumentality (whether federal, state, local or foreign), failure of technical facilities, failure or delay of transportation facilities, illness or incapacity of any performer or producer, or other cause of similar or different nature not reasonably within Company's control, Company is materially hampered in the recording, manufacture, distribution or sale of records, then, without limiting Company's rights, Company shall have the option by giving you notice to suspend the then current Contract Period for the duration of any such contingency plus such additional time as is necessary so that Company shall have no less than thirty (30) days after the cessation of such contingency in which to exercise its option, if any, for the next following Option Period.

15.3 If Company refuses to allow you to fulfill your Recording Commitment for any Contract Period and if, not later than sixty (60) days after that refusal takes place you notify Company of your desire to fulfill such Recording Commitment, then Company shall permit you to fulfill said Recording Commitment by notice to you to such effect within sixty (60) days of Company's receipt of your notice. Should Company fail to give such notice, you shall have the option to terminate the term of this agreement by notice given to Company within thirty (30) days after the expiration of the latter sixty-day period; on receipt by Company of such notice the term of this agreement shall terminate and all parties will be deemed to have fulfilled all of their obligations hereunder except those obligations which survive the end of the term (e.g., warranties, re-recording restrictions and obligation to pay royalties) at which time Company shall pay to you at the rate of union scale in full settlement of its obligation in connection therewith, which payment shall constitute an Advance. In the event you fail to give Company either notice within the period specified therefore, Company shall be under no obligation to you for failing to permit you to fulfill such Recording Commitment.

## 16. AGREEMENTS, APPROVAL AND CONSENT

23

16.1 As to all matters treated herein to be determined by mutual agreement, or as to which any approval or consent is required, such agreement, approval or consent will not be unreasonably withheld.

16.2 Except as otherwise specifically provided herein, your or Company's agreement, approval or consent, whenever required shall be deemed to have been given unless either party notifies the other party otherwise within ten (10) business days following the date of receipt by said party of the written request therefore.

## 17. NOTICES

17.1 Except as otherwise specifically provided herein, all notices hereunder shall be in writing and shall be given by personal delivery, registered mail or telegraph (prepaid), at the addresses shown above, or such other address or addresses as may be

24

designated by either party. Notices shall be deemed given when mailed or delivered to a telegraph office, except that notice of change of address shall be effective only from the date of its receipt. Copies of all notices to Company will be sent to Howard L. Sapper, 270 Perkins Street, Sonoma, California 95476.

## 18. MISCELLANEOUS

18.1 This agreement contains the entire understanding of the parties hereto relating to the subject matter hereof and cannot be changed or terminated except by an instrument signed by you and an officer of Company. A waiver by either party of any term or condition of this agreement in any instance shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof. All remedies, rights, undertakings, obligations, and agreements contained in this agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either party.

18.2 Those provisions of any applicable collective bargaining between Company and any labor organization which are by the term of such agreement, to be included in this shall be deemed incorporated herein.

18.3 Company may assign its rights under this agreement in whole or in part to a subsidiary, parent, or affiliate or to any entity with which Company shall merge or consolidate or to any entity acquiring the stock or substantially all of the assets of Company.

18.4 Each option and/or election granted to Company hereunder including, without limitation, to suspend the running of one or more periods of time specified in this agreement, to terminate the term of this agreement, or otherwise, is separate and distinct, and the exercise of any such option or election shall not operate as a waiver of any other option or election unless specifically so stated by Company in its notice of exercise of such option or election.

18.5 You shall not be entitled to recover damages or to terminate the term of this agreement by reason of any breach by I obligations thereunder, unless Company has failed to remedy such breach within thirty (30) days following receipt of your notice thereof.

18.6 This agreement has been entered into in the State of California, and the validity, interpretation and legal effect of this agreement shall be governed by the laws of the State of California applicable to contracts entered into in the State of California. The California courts (State and Federal), only, will have jurisdiction of any controversies regarding this agreement; any action or other proceeding which involves such a controversy will be brought in those courts,

and not elsewhere. Any process in any such action or proceeding may, among other methods, be served upon either party by delivering it or mailing it, by registered or certified mail, directed to the address first above written or such other address as such party may designate pursuant to paragraph 17. Any such delivery or mail service shall be deemed to have the same force and effect as personal service within the State of California.

18.7 In entering into this agreement, and providing services pursuant hereto, you shall have the status of independent contractor and nothing herein contained shall contemplate or constitute you as Company's agent or employee.

18.8 This agreement shall not become effective until executed by all proposed parties hereto.

18.9 Company reserves the right to any and all work by signed Artist in group or solo context. Company agrees not to withhold performances for artists solo careers if Company is not prepared to provide opportunities. Company then reserves the right of first refusal to match any and all offers Artists solo careers if Company does not exercise said option. Company reserves the right to a 2% of retail override royalty payable to Company in above mentioned circumstances.

18.10 If Company does not provide photographer and/or graphic artist, Company to pay for photo session and promotional poster/flyer for each option period. Artist to provide reasonable quotes for services and photo sessions costs.

18.11 Publishing: Artist authorizes Company to seek out commercial sources of income from the use of Artists music, including not only "Hand in Hand", but also all the other music by Artist for which there are no exclusive rights.

A. It is understood that Artist must approve in writing each such deal before Artist music may be utilized in each such case. Artist agrees to not withhold such approval except in extreme cases.

B. For any such work where the connection came about through Company, Artist agrees to give 35% of all such payments to Company, if the agreement involves already-existing Artist music.

C. For any such work where the connection came about through Company, Artist agrees to give 25% of all such payments to Company, if the agreement involves creating new music. It is understood that in the case of creating new music, Artist would have to be centrally involved in negotiation details.

19. MARKETING

26

19.1 Company shall provide artist with sixty (60) promotional compact discs and fourty (20) promotional cassettes of each Album under this Agreement.

19.2 Company shall spend at least seven (7%) percent of their net receipts in promotion and advertising each Album under this Agreement.

IN WITNESS WHEREOF, the parties have executed this agreement as of the date first hereinabove set forth.

Howard L. Sapper, President/CEO          12/12/93
GLOBAL PACIFIC RECORDS, INC.             Date

Randy Armstrong                          12/9/93
                                         Date

Volker Nahrmann                          12/9/93
                                         Date

27

# EXHIBIT F

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Registration Number:**

## SR 609-547

**Effective date of registration:**

October 30, 2007

---

## Title

Title of Work: Hand In Hand

Contents Titles: 1. Alegria 2. Nineteen 92 3. Banji 4. Smiling Back (Introduction) 5. Smiling Back 6. Lakota 7. Hand In Hand 8. Matisse 9. Monsoon 10. Hamburg, USA 11. I Have A Dream (Introduction) 12. I Have A Dream

## Completion/Publication

Year of Completion: 1992

Date of 1st Publication: September 30, 1992   Nation of 1st Publication: United States

## Author

■   Author: Randy Armstrong

Author Created: co-author of sound recordings

Work made for hire: No

Citizen of: United States

Year Born: 1951

■   Author: Volker Nahrmann

Author Created: co-author of sound recordings

Work made for hire: No

Domiciled in: United States

Year Born: 1960

## Copyright claimant

Copyright Claimant: Randy Armstrong
85 Beauty Hill Road, Barrington, NH, 03825

Copyright Claimant: Volker Nahrmann
329 Nashua Rd., Billerica, MA, 01821

## Limitation of copyright claim

Previously registered: No

## Certification

**Name:** Aaron Silverstein

**Date:** October 23, 2007

**Correspondence:** Yes

**Copyright Office notes:** Regarding deposit: Special Relief granted under 202.20(d) of C.O. regulations

# EXHIBIT G

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Registration Number**

**PA 1-589-379**

**Effective date of registration:**

**October 30, 2007**

## Title

**Title of Work:** 1. Nineteen 92 2. Bahji 3. Lations 4. Matisse in Morocco 5. Hamburg, USA 6. I Have A Dream (Introduction) 7. I Have A Dream contained in Hand in Hand

**Nature of Work:** Words and Music

## Completion/Publication

**Year of Completion:** 1992

**Date of 1st Publication:** September 30, 1992     **Nation of 1st Publication:** United States

## Author

■ **Author:** Randy Armstrong

**Author Created:** Words and Music

**Work made for hire:** No

**Citizen of:** United States

**Year Born:** 1954

## Copyright claimant

**Copyright Claimant:** Randy Armstrong

83 Beauty Hill Road, Barrington, NH, 03825

## Limitation of copyright claim

**Previously registered:** No

## Certification

**Name:** Amor Silverman

**Date:** October 24, 2007

**Correspondence:** Yes

Page 1 of 1

# **EXHIBIT H**

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

Marybeth Peters

Register of Copyrights, United States of America

**Registration Number:**

**PA 1-589-378**

**Effective date of registration:**

**October 30, 2007**

## Title

**Title of Work:** 1. Alegria 2. Smiling Back (Introduction) 3. Smiling Back 4. Hand In Hand 5. Egberto; contained in Hand in Hand

**Nature of Work:** Music

## Completion/Publication

**Year of Completion:** 1992

**Date of 1st Publication:** September 30, 1992          **Nation of 1st Publication:** United States

## Author

■          **Author:** Volker Nahrmann

**Author Created:** Music

**Work made for hire:** No

**Domiciled in:** United States

**Year Born:** 1960

## Copyright claimant

**Copyright Claimant:** Volker Nahrmann

319 Nashua Rd., Billerica, MA, 01821

## Limitation of copyright claim

**Previously registered:** No

## Certification

**Name:** Aaron Silverstein

**Date:** October 24, 2007

**Correspondence:** Yes